**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

EUGENIO MATHIS, as Personal Representative of the
ESTATE OF EFRAIN MARTINEZ, deceased,

        Plaintiff,

        - against -

CENTURION CORRECTIONAL HEALTHCARE OF
NEW MEXICO, LLC; MHM HEALTH
PROFESSIONALS, INC.; LOVELACE HEALTH
SYSTEMS, LLC; DR. GARY FRENCH; DR. MURRAY
YOUNG; DR. JAMES BRADLEY; DR. VESTA
SANDOVAL; PA ELLEN WHITTMAN; RN ERIN
FORSBERG; WARDEN JOHN GAY; DAVID SELVAGE;
VICKI BOWERS; CO ARCHULETA; CO PALOMINO;
CO ABATE; CO ANTHONY MARTINEZ; CO ORTIZ;
DAY SHIFT L POD CONTROL OFFICER; AND DOE
DOCTORS 1-2,

        Defendants.

No. _____

**COMPLAINT AND**
**DEMAND FOR JURY**
**TRIAL**

        Plaintiff Eugenio Mathis ("Plaintiff"), as personal representative of the estate of Efrain

Martinez ("Mr. Martinez"), deceased, by his attorneys, Collins & Collins, P.C. and Guebert

Gentile & Piazza P.C., and pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 2201 and

2202, brings this action (the "Complaint") to redress violations of Mr. Martinez's Eighth and

Fourteenth Amendment rights under the United States Constitution, and alleges, based on personal

knowledge as to his own experiences and otherwise on information and belief, as follows:

**PRELIMINARY STATEMENT**

        1.    The New Mexico Corrections Department ("NMCD"), Centurion Correctional

Healthcare of New Mexico, LLC ("Centurion"), and MHM Health Professionals, Inc. ("MHM"),

acting through their respective employees, staff, agents and assigns named above in their

individual capacities, knew that Mr. Martinez was at a high risk of developing endocarditis and that he was suffering from increasing and debilitating pain that was not ameliorated over time or through pain medication. Yet, Defendants deliberately and recklessly ignored an emergent infection and Mr. Martinez's high risk of endocarditis, which caused him to spend 45 days in the hospital, and ultimately, to die.

2.      Additionally, the abovenamed Defendants, along with Defendant Lovelace Health Systems, LLC ("Lovelace") and Lovelace agents, engaged in a conspiracy to violate Mr. Martinez's Eight Amendment protections against cruel and unusual punishment by sanctioning his death—unlawfully authorizing medical providers to remove Mr. Martinez from life-sustaining medical care.

3.      Mr. Martinez's injuries and subsequent death were, in part, the result of Centurion's widespread pattern and practice of failing to provide constitutionally adequate medical care and effectively denying patients access to medical care.

4.      The actions and inactions of Defendants violated Mr. Martinez's rights secured by 42 U.S.C. § 1983 under the Eighth and Fourteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

5.      This action arises under the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988.

6.      Subject matter jurisdiction in conferred by 28 U.S.C. §§ 1331 and 1343(a).

7.      This Court has personal jurisdiction over each of the entity and individual Defendants because, upon information and belief, all Defendants are domiciled in the State of New Mexico (the "State") and/or have substantial contacts in the State of New Mexico and purposefully

availed themselves of conducting business in New Mexico.

8.     Venue is proper here under 28 U.S.C. § 1391(b)(2), because, upon information and belief, a majority of the Defendants reside in this judicial district and the events and omissions giving rise to Plaintiff's claims occurred in this judicial district.

9.     Plaintiff need not exhaust any administrative remedies under the Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA"), because Mr. Martinez is not currently incarcerated, as he is deceased.

## PARTIES

10.     Efrain Martinez was a citizen of the United States and New Mexico, and Plaintiff Eugenio Mathis is presently domiciled in San Miguel County, New Mexico. During the events giving rise to this action, Mr. Martinez was physically located in New Mexico. During all relevant times, he was in the custody of NMCD, housed in the Penitentiary of New Mexico ("PNM") in Santa Fe, New Mexico, and NMCD had a duty to provide him with medical care and treatment consistent with applicable and prevailing standards of medical care.

11.     Defendant Centurion is a domestic limited liability company registered to do business in New Mexico, whose registered agent for service of process is CT Corporation System, 206 S. Coronado Avenue, Española, New Mexico, 87532-2792. Centurion, by the terms of General Services Contract #16-770-1300-0097 ("GSC"), was contracted by NMCD for the purposes of providing medical care to inmates in the NMCD prison system, including Mr. Martinez. The term of the GSC began on June 1, 2016 and ended on or about November 1, 2019. The GSC was to end on June 1, 2020 under a one year extension but ended prematurely.

12.     Under the GSC, Centurion was acting as the apparent and actual agent, servant, and

contractor of NMCD and was responsible for the care, health, safety, and proper medical treatment of all detainees in NMCD's facilities, including Mr. Martinez. Pursuant to the GSC, NMCD adopted Centurion's policies, practices, habits, customs, procedures, training, and supervision as its own, and Centurion adopted NMCD's policies, practices, habits, customs, procedures, training, and supervision as its own. Centurion acted by and through its employees, staff, agents and assigns who are named in their individual capacities.

13.     Defendant MHM is a Delaware for-profit corporation that contracted to supply medical personnel to Centurion for purposes of providing medical services to NMCD prisoners, including Mr. Martinez. Through the "Health Services Addendum Between MHM Professionals, Inc. and Centurion Healthcare of New Mexico, LLC," MHM became a subcontractor operating under the contract between Centurion and NMCD.

14.     Accordingly, MHM was acting as the apparent and actual agent, servant, and contractor of NMCD and was responsible for the care, health, safety, and proper medical treatment of all detainees in NMCD's facilities, including Mr. Martinez. Pursuant to MHM's contract with Centurion as a subcontractor under the GSC, MHM adopted Centurion's and NMCD's policies, practices, habits, customs, procedures, training, and supervision as its own, and NMCD and Centurion adopted MHM's policies, practices, habits, customs, procedures, training and supervision as their own.

15.     Defendant Lovelace Health Systems, LLC ("Lovelace") is a New Mexico domestic limited liability company that was responsible for the care, health, safety, and proper medical treatment of Mr. Martinez while he was in NMCD custody and being treated in a Lovelace medical facility from November 29, 2018 through January 11, 2019. While Mr. Martinez was receiving

medical treatment from Lovelace, Lovelace and its agents wielded authority over him that was delegated by the State. Accordingly, throughout this time, Lovelace was engaged in a joint activity with New Mexico State and its agents, and thereby acting under color of state law at all times relevant to this Complaint.

16.     Upon information and belief, Lovelace was acting as a contractor for Centurion when it provided medical services to Mr. Martinez at all times relevant to this complaint. Accordingly, Lovelace was operating as a subcontractor operating under the contract between Centurion and NMCD. As a result, Lovelace was acting as the apparent and actual agent, servant, and contractor of NMCD and was responsible for the care, health, safety, and proper medical treatment of all NMCD detainees to whom it provided care, including Mr. Martinez. Pursuant to Lovelace's contract with Centurion as a subcontractor under the GSC, NMCD and Centurion adopted Lovelace's policies, practices, habits, customs, procedures, training and supervision as their own.

17.     Defendant Dr. Gary French was an attending doctor for Mr. Martinez while he was in NMCD custody, and as such was acting within the scope of his employment as the apparent and actual agent, servant, and/or employee of Centurion and MHM. He was responsible for the care, health, safety, and proper medical treatment of Mr. Martinez. He is sued herein in his individual capacity.

18.     Defendant Dr. Murray Young was a Centurion/NMCD regional medical director overseeing Mr. Martinez's region while he was in NMCD custody, and as such was responsible for the care, health, safety, and proper medical treatment of Mr. Martinez. He was an agent of Centurion and/or NMCD, acting within the scope of his employment at all times relevant to this

lawsuit. He is sued herein in his individual capacity.

19.    Defendant Dr. James Bradley was a Lovelace agent attending to Mr. Martinez while he was at Lovelace Medical Center and in NMCD custody, and as such was acting within the scope of his employment as an apparent and actual agent, servant, and/or employee of Lovelace. He was responsible for the care, health, safety, and proper medical treatment of Mr. Martinez. He is sued herein in his individual capacity.

20.    Defendant Dr. Vesta Sandoval was the Lovelace Chief Medical Officer while Mr. Martinez was at Lovelace Medical Center and in NMCD custody, and as such was acting withing the scope of her employment as an apparent and actual agent, servant, and/or employee of Lovelace. She was responsible for the care, health, safety, and proper medical treatment of Mr. Martinez. She is sued herein in her individual capacity.

21.    Defendant Vicki Bowers was part of the Lovelace risk management team while Mr. Martinez was at Lovelace Medical Center and in NMCD custody, and as such was acting within the scope of her employment as an apparent and actual agent, servant, and/or employee of Lovelace. She was responsible for the care, health, safety, and proper medical treatment of Mr. Martinez. She is sued herein in her individual capacity.

22.    Defendant Physician's Assistant ("PA") Ellen Whittman was an attending physician's assistant for Mr. Martinez while he was in NMCD custody, and as such was acting within the scope of her employment as the apparent and actual agent, servant, and/or employee of Centurion and MHM. She was responsible for the care, health, safety, and proper medical treatment of Mr. Martinez. She is sued herein in her individual capacity.

23.    Defendant Registered Nurse ("RN") Erin Forsberg was an attending nurse for Mr.

Martinez while he was in NMCD custody, and as such was acting within the scope of her employment as the apparent and actual agent, servant, and/or employee of Centurion and MHM. She was responsible for the care, health, safety, and proper medical treatment of Mr. Martinez. She is sued herein in her individual capacity.

24.     Doe Doctor One was an attending medical care provider for Mr. Martinez while he was in NMCD custody and was responsible for the care, health, safety, and proper medical treatment of Mr. Martinez. He/she was an agent of Centurion and MHM, acting within the scope of his/her employment at all times relevant to this lawsuit. He/she is sued herein in his/her individual capacity.

25.     Doe Doctor Two (                        ) was an attending medical care provider for Mr. Martinez while he was in NMCD custody and was responsible for the care, health, safety, and proper medical treatment of Mr. Martinez. He/she was an agent of Centurion and MHM, acting within the scope of his/her employment at all times relevant to this lawsuit. He/she is sued herein in his/her individual capacity.

26.     Defendant John Gay was the PNM Warden at all times relevant to this Complaint and was responsible for the care, health, safety, and proper medical treatment of Mr. Martinez. Upon information and belief, he was a decisionmaker responsible for training, supervision, and disciplining agents of the prison. He was an agent of NMCD, acting within the scope of his employment at all times relevant to this lawsuit. He is sued herein in his individual capacity.

27.     Defendant David Selvage was the NMCD Health Services Administrator/Manager at all times relevant to this Complaint and was responsible for the care, health, safety, and proper medical treatment of Mr. Martinez. He was an agent of NMCD, acting within the scope of his

employment at all times relevant to this lawsuit. He is sued herein in his individual capacity.

28.     Defendants CO Archuleta, CO Palomino, CO Abate, and CO Anthony Martinez were the four main day-shift pod officers assigned to the PNM L Pod in and around the months of September to December 2018. They were responsible for the care, health, safety, and proper medical treatment of Mr. Martinez. They were agents of NMCD, acting within the scope of their employment at all times relevant to this lawsuit. They are sued herein in their individual capacities.

29.     Defendant CO Ortiz was one of two main day-shift control officers assigned to the PNM L Pod in and around the months of September to December 2018. He was responsible for the care, health, safety, and proper medical treatment of Mr. Martinez. He was an agent of NMCD, acting within the scope of his employment at all times relevant to this lawsuit. He is sued herein in his individual capacity.

30.     Defendant Day Shift L Pod Control Officer was one of two main day-shift control officers assigned to the PNM L Pod in and around the months of September to December 2018. He/she was responsible for the care, health, safety, and proper medical treatment of Mr. Martinez. He/she was an agent of NMCD, acting within the scope of his/her employment at all times relevant to this lawsuit. He/she is sued herein in his/her individual capacity.

31.     At all times relevant to this Complaint, each of the abovenamed Defendants was an employee and/or agent of a New Mexico state-run entity or a private medical service responsible for treating State prisoners, a task which was ultimately the responsibility of the State. Accordingly, all Defendants were acting under color of state law at all relevant times.

**FACTUAL BACKGROUND**

**I. MR. MARTINEZ DISPLAYED AND COMPLAINED OF SEVERE PAIN FOR NEARLY THREE MONTHS BEFORE FINALLY BEING TRANSFERRED TO A HOSPITAL, WHERE HE SUBSEQUENTLY DIED.**

32.     At the time that Mr. Martinez began complaining of his medical injuries, he was 39 years old and imprisoned by NMCD at PNM in Santa Fe, New Mexico.

33.     On September 11, 2018, Mr. Martinez submitted a health services request form, complaining to Centurion medical staff of intense heartburn that kept him up at night and was not improved by over-the-counter antacids. He requested stronger medication. (Ex. 1 at 5). A Centurion nurse reviewed this form and, upon information and belief, scheduled Mr. Martinez to be seen by medical staff the next day. (*Id.*).

34.     On September 12, 2018, Mr. Martinez was seen by Doe Doctor One, who diagnosed Mr. Martinez as merely experiencing heartburn and, upon information and belief, provided no physical examination, diagnostic testing, or additional treatment. (*Id.* at 4).

35.     On September 20 and 23, 2018, Mr. Martinez submitted two additional health services request forms expressing concern about his "heart burn or ulcer" that is "horrible, hurts & doesn't let [him] sleep" and which was "getting worse." (*Id.* at 2-3).

36.     In response, Doe Doctor Two (            ) scheduled Mr. Martinez for a medical appointment with a physician's assistant on October 8, 2018—delaying Mr. Martinez's medical evaluation and treatment for 18 days despite having knowledge that Mr. Martinez's chest pain was severe and that over-the-counter antacids were ineffective. (*Id.* at 3).

37.     Also in response, RN Erin Forsberg (            ) merely gave Mr. Martinez Tums on September 25, 2018 and did nothing to expedite his appointment with a physician despite knowing

9

that Mr. Martinez's chest pain was worsening and so severe that he could not sleep. (*Id.* at 2).

38.    During this time, Mr. Martinez's physical condition was noticeably and rapidly deteriorating. He became very thin in only a matter of weeks, and he stopped exercising in the yard, which was his usual daily activity. Prior to his medical injuries, he had always been extremely physically fit and muscular, so his rapid deterioration was even more noticeable.

39.    Upon information and belief, Defendants CO Archuleta, CO Palomino, CO Abate, CO Anthony Martinez, CO Ortiz, and Defendant Day Shift L Pod Control Officer (together, "Prison Defendants") all observed Mr. Martinez's rapidly deteriorating condition beginning in September 2018 at the latest, but they did nothing to ensure that Mr. Martinez was given a proper medical evaluation in a timely manner. Upon information and belief, none of them requested that Mr. Martinez be evaluated by prison medical staff despite his apparent serious pain and deterioration.

40.    Upon information and belief, Defendants CO Archuleta, CO Palomino, CO Abate, and CO Anthony Martinez were all day-shift pod officers who conducted daily "rounds" of Mr. Martinez's cell three times a day between 6:00 AM and 4:30 PM from September through December 2018. They each saw Mr. Martinez in his cell and in the day room during "Tier Time" (Day Room "free" time) at least once during each of their shifts. They were also required to pat down Mr. Martinez each day when he left his cell for Tier Time. So, they were each on notice of his visibly ill state and witnessed his rapid deterioration during each of their work shifts.

41.    Upon information and belief, Defendant CO Ortiz and Defendant Day Shift L Pod Control Officer were both day-shift control officers who oversaw Mr. Martinez's cell from September through December 2018. Upon information and belief, they observed Mr. Martinez in

his cell and in the Day Room during each of their shifts through high-resolution surveillance cameras, so they were also both on notice of his visibly ill state and witnessed his rapid deterioration during each of their work shifts.

42.     On September 26, 2018, Doe Doctor Two discussed Mr. Martinez's worsening, severe chest pain and medical condition with Defendant PA Ellen Whittman. (*Id.* at 1). Yet, upon information and belief, nothing was done to expedite Mr. Martinez's medical appointment, and he was provided with no medical care or further evaluation at the time. (*Id.*).

43.     On October 8, 2018, when Mr. Martinez was finally able to see a physician, Defendant Whittman merely diagnosed him with "indigestion" and continued to provide him with the same over-the-counter antacids that, upon information and belief, she knew had been ineffective. (Ex. 2).

44.     Upon information and belief, from October 8, 2018 to November 25, 2018, Mr. Martinez received no medical attention despite his worsening condition and repeated pleas for medical assistance to alleviate his severe chest pain.[1]

45.     Around the end of October 2018, Mr. Martinez began to physically deteriorate even more rapidly. His severe illness became extremely apparent, as his face was pale, his cheeks were dramatically sunken in, and he lost almost all of his body mass. He appeared very physically weak, a dramatic shift from his muscular appearance just a few months prior.

46.     Beginning in mid-November 2018, Mr. Martinez stopped eating all or most of his meals. Around November 23, 2018, he began regurgitating all fluids and foods that he attempted

---

[1] Plaintiff requested Mr. Martinez's entire medical record from NMCD and Centurion, and she received no medical records for this time period—a fact which is particularly alarming given that the missing records encompass the 6-7 week time period immediately preceding Mr. Martinez's hospitalization due to life-threatening injuries.

to consume. Upon information and belief, the smell and sight of his vomit and rotting meals remained in his cell during the last week of November 2018. Mr. Martinez also stopped leaving his cell and would no longer socialize in the yard or the Day Room.

47.     Upon information and belief, throughout this time, the Prison Defendants were aware of Mr. Martinez's poor physical state through witnessing this physical deterioration and seeing and/or smelling his vomit and the rotting, uneaten food in his cell.

48.     Throughout this time, Defendants Centurion, MHM, Whittman, Forsberg, and Doe Doctors One and Two (together, "Defendant Medical Providers") each knew that Mr. Martinez was suffering from excruciating and worsening chest pain that was not ameliorated by antacids, and which he thought might be an ulcer. Yet, none of these Defendants took steps to ensure that Mr. Martinez received a proper and timely medical evaluation, diagnosis, and/or treatment.

49.     Upon information and belief, during the last week of November 2018, Mr. Martinez's cell neighbor, Johnathan Sanchez, submitted a health services request form on Mr. Martinez's behalf because he was so worried about Mr. Martinez's poor health.

50.     On November 25, 2018, Mr. Martinez submitted another health services request form stating that he was "very weak," "very ill," and had not been able to ingest liquid or food for a few days without regurgitating it. (Ex. 3 at 5). He expressed that he "[n]eed[ed] medical attention A.S.A.P." (*Id.*).

51.     A day later, Mr. Martinez fainted in his housing unit. At the time, he was not able to stand up on his own and had to be carried by fellow prisoners. Only then did Defendant Forsberg transfer Mr. Martinez to the medical unit, emphasizing that he was in "urgent" need of medical attention by that time. (*Id.*).

52.    While in the medical unit, Defendant Forsberg attended to Mr. Martinez. (*Id.* at 3-4). She noted that he had been vomiting large amounts of yellow liquid for two days and had not eaten since Thanksgiving (four days prior). (*Id.* at 4). He had lost five pounds in two days and had a temperature of 99.1 degrees. (*Id.*). She also noted that he appeared "weak," "very pale/yellow," and had "small circular mark along the veins on both left and right arm." (*Id.*).

53.    Upon information and belief, Defendant Forsberg informed Defendant Dr. Gary French ( _ _ _ _ _ ) of Mr. Martinez's above medical condition, and Mr. Martinez was then held in the medical unit for further observation. (*Id.*). At the time, upon information and belief, Mr. Martinez was given insufficient medical examinations and treatment. (Ex. 3-4).

54.    On November 27, 2018, Defendant Forsberg noted that Mr. Martinez was walking very slowly, "still unable to eat or keep fluids down" and was complaining of a "massive headache" and "blurry vision in [his] right eye." (Ex. 3 at 2). She noted that his right eye was "cloudy," "inflamed and red." (*Id.*). She spoke with Defendant French over the phone and, upon information and belief, informed him of Mr. Martinez's condition. (*Id.*).

55.    As a result of Mr. Martinez's nausea, "high fever, back pain and headache" and other symptoms, Defendant French sent him to the emergency room of Christus St. Vincent Regional Medical Center ("St. Vincent") in an ambulance. (*Id.* at 1).

56.    Upon information and belief, in light of Mr. Martinez's symptoms and the evidence of his possible intravenous drug use, Defendant Medical Providers should have suspected a possible diagnosis of infective endocarditis near the onset of Mr. Martinez's symptoms in September 2018 and referred Mr. Martinez to an off-site medical provider for further evaluation at that time, especially considering the fact that infective endocarditis carries a high risk of

mortality.

57.     However, Mr. Martinez was not transferred to an off-site medical provider until 77 days after his initial complaints of severe chest pain. Such a delay in the face of Mr. Martinez's debilitating condition and severe pain constitutes deliberate indifference to Mr. Martinez's serious medical needs—an indifference that ultimately caused Mr. Martinez's death.

## II.    AFTER RECEIVING WEEKS OF CRITICAL CARE, MR. MARTINEZ WAS UNLAWFULLY WITHDRAWN FROM MEDICAL CARE AND PASSED AWAY DUE TO HIS SEVERE INFECTION.

58.     When Mr. Martinez arrived at St. Vincent's emergency room, he was in "critical" condition, "acute distress," and "[t]oxic appearing." (Ex. 5 at 3, 7, 12). His pain was "sharp and throbbing, 10/10," and he had been experiencing "constant severe symptoms" for at least 5-6 days. (*Id.* at 7).

59.     Notably, NMCD and/or Centurion/MHM personnel had informed St. Vincent that they had been "concern[ed] for sepsis." (*Id.* at 7).

60.     After some initial testing, Mr. Martinez was given an emergency blood transfusion, admitted into the intensive care unit for further assessment, and subsequently transferred to Lovelace Medical Center to undergo cardiothoracic (heart) surgery. (*Id.* at 3, 8).

61.     While at St. Vincent, he was diagnosed with, *inter alia*, acute bacterial endocarditis (infection of the inner layer of the heart); acute aortic regurgitation (leaking heart chamber); severe thrombocytopenia (low blood platelet count); and severe sepsis (life-threatening, overwhelming infection). (*Id.* at 3).

62.     St. Vincent doctors noted that "[c]ritical care was necessary to treat or prevent imminent or life-threatening deterioration" that could be caused by the following conditions:

sepsis, acute encephalopathy (brain damage due to infection in the blood), and meningitis (swelling of brain's protective membranes due to infection). (*Id.* at 12).

63.     From November 29, 2018 until his death on January 11, 2019, Mr. Martinez remained at Lovelace Medical Center under the constant care and evaluation of Lovelace medical providers.

64.     On December 14, 2018, Mr. Martinez began coughing up blood throughout the night, and nurses noted his worsening condition. (Ex. 6). His blood pressure dropped rapidly, blood was "gushing out" of his breathing tube, and a "crash cart" was brought into his room in anticipation that he would require emergency resuscitation. (*Id.*).

65.     Mr. Martinez's condition continued to worsen. By January 8, 2019, he had been diagnosed with acute respiratory failure, severe sepsis and septic shock, and acute bacterial endocarditis, among many other injuries. (Ex. 7). He was evaluated as being "in eminent risk of significant decompensation as he [was] still in shock with renal and respiratory failure." (*Id.* at 2). It was ordered that he be "monitored very closely throughout the day." (*Id.*).

66.     On January 11, 2019, Lovelace medical providers, including Defendant Dr. James Bradley, spoke with Defendant Dr. Murray Young, a Centurion/NMCD regional medical director; Defendant John Gay, the PNM Warden; and Defendant David Selvage, NMCD Health Services Administrator/Manager, about whether to remove Mr. Martinez from life support devices and care. (Ex. 8).

67.     Without consulting Mr. Martinez's family, who were visiting him in the hospital daily at the time, Defendants Young, Gay, and Selvage unlawfully directed Lovelace medical providers to end Mr. Martinez's life by removing him from life support. (*Id.*).

68.     In response, Defendant Bradley consulted with other Lovelace agents—including Defendant Dr. Vesta Sandoval, the Lovelace Chief Medical Officer, and Defendant Vicki Bowers from the Lovelace risk management team—about whether to remove Mr. Martinez from life support devices and care. (*Id.*).

69.     Subsequently, Defendant Bowers spoke with Defendants Young, Gay, and Selvage to confirm that Mr. Martinez would be removed from life sustaining medical devices and care. (*Id.*). "Everyone [was] in agreement with comfort measures and withdrawal of care" at that time. (*Id.*).

70.     However, none of the Defendants involved in this decision had consulted with Mr. Martinez or his lawful surrogate, agent, and/or guardian when reaching this decision. Upon information and belief, each of the Defendants involved in this decision knew that Mr. Martinez's family had not been consulted about the decision.

71.     Without having lawful informed consent from either Mr. Martinez or a lawful surrogate, agent, and/or guardian, Defendants Lovelace, Bradley, Sandoval, and Bowers all agreed to remove Mr. Martinez from life sustaining medical care based on the improper direction of Defendants Centurion, MHM, Young, Gay, and Selvage.

72.     Accordingly, Defendants Centurion, MHM, Lovelace, Young, Gay, Selvage, Bradley, Sandoval and Bowers all violated State law regarding informed consent, as none of the individuals consulted had the authority to authorize Lovelace medical staff to remove Mr. Martinez from life support measures and end his life. *See* NMSA § 24-7A-5 (outlining the priority of individuals who may act as surrogate healthcare decision-makers on behalf of patients who are incapacitated and who have not appointed an agent or guardian to make such decisions for them).

73.     Even worse, Mr. Martinez's family was vehemently opposed to removing Mr. Martinez from life support measures at the time. (Ex. 11 at 2). Yet, Mr. Martinez's family was not consulted about arguably the most important medical decision of his life. Defendants unlawfully stripped Mr. Martinez's family of their right to make that decision.

74.     Moving forward, instead of providing Mr. Martinez with medical care, Lovelace merely provided him with "comfort measures" to ease him into death during the final hours of his life. (*Id.*). Lovelace medical staff had essentially deemed him incurable.

75.     At 5:18pm on January 11, 2019, Mr. Martinez passed away. (Ex. 9). According to the Lovelace death report, his primary cause of death was "cerebral herniation" (displacement of brain tissue due to brain swelling and/or bleeding). (*Id.*). And according to the autopsy report, the primary cause of death was "aortic and mitral valve endocarditis." (Ex. 10).

## III.    CENTURION DEMONSTRATED A PERSISTENT AND WIDESPREAD PATTERN AND PRACTICE OF FAILING TO MEET THE STANDARDS OF CARE IN TREATING PATIENTS IN THE MEDICAL UNIT, EFFECTIVELY DENYING THEM MEDICAL CARE, AND THIS PRACTICE CAUSED MR. MARTINEZ'S INJURIES.

76.     Centurion maintained various widespread patterns and practices which violated Mr. Martinez's constitutional rights and contributed to his untimely death, including: (1) failing to report, diagnose, and properly examine and treat prisoners with serious medical and/or mental health conditions; (2) delaying or denying patient referrals to necessary emergency or other offsite medical services; (3) severely understaffing its medical and mental health facilities; (4) failing to provide adequate medical documentation or communicate changes in patient conditions to the appropriate correctional officers and/or medical or mental health staff; and (5) failing adequately to train and supervise its employees and agents on procedures necessary to protect patients' health.

77.    In essence, Centurion's medical care of NMCD prisoners effectively amounted to no medical care at all. *Kikumura v. Osagie*, 461 F.3d 1269, 1295 (10th Cir 2006) (finding sufficient deliberate indifference allegations where "the medical treatment [plaintiff] received was merely a façade . . . [and] so cursory as to amount to no treatment at all") (internal cites and quotes omitted); *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) ("[D]eliberate indifference to inmates' health needs may be shown by . . . proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care.").

A.    <u>Centurion had a pattern and practice of failing to report, diagnose, and treat warning signs of serious medical and mental health conditions, and of delaying or denying patients access to critical off-site medical services, which were contributing factors to Mr. Martinez's injuries.</u>

78.    Centurion failed to report, diagnose, and treat the warning signs of serious conditions for many other patients in circumstances similar to those of Mr. Martinez. For example:

- In *Jerry Sisneros v. Centurion et al.*, No. D-101-CV-2019-00598 (N.M. 1st Dist. Ct.), Centurion failed to timely report, diagnose, and treat signs of diskitis and osteomyelitis, which resulted in the patient's needlessly extended suffering and over a month of avoidable off-site care.

- In *Gerald Wilson v. Centurion et al.*, No. D-101-CV-2019-00691 (N.M. 1st Dist. Ct.), Centurion failed to timely report, diagnose, and treat signs of discitis and osteomyelitis, which resulted in the patient developing severe sepsis and lifelong spinal disabilities, and being hospitalized for 35 days.

- In *George Yribe v. Centurion et al.*, No. D-101-CV-2019-00633 (N.M. 1st Dist. Ct.), Centurion failed to timely report, diagnose, and treat signs of diskitis and osteomyelitis, which resulted in the patient developing serious and permanent injury.

- In *George Parra v. Centurion et al.*, No. D-101-CV-2018-01188 (N.M. 1st Dist. Ct.), Centurion failed to timely report, diagnose, and treat signs of advanced muscular dystrophy and severe spinal infection, which resulted in the patient being sent to the emergency room.

- In *Dominick Mora-Solis v. Centurion et al.*, No. D-101-CV-2019-00627 (N.M. 1st Dist. Ct.), Centurion failed to timely report, diagnose, and treat signs of a severe pressure ulcer, sepsis, and acute chronic osteomyelitis, which resulted in permanent injuries to the patient.

- In *Jade Hetes v. Centurion et al.*, No. D-101-CV-2019-00113 (N.M. 1st Dist. Ct), Centurion failed to timely report, diagnose, and treat signs of severe mental illness, which resulted in the patient's death from suicide.

- In *Manuela Vigil v. Centurion et al.*, No. D-101-CV-2018-00033 (N.M. 1st Dist. Ct.), Centurion failed to timely report, diagnose, and treat signs of abscesses, which resulted in the patient's death.

- In *Michael Wilder v. Centurion et al.*, No. D-101-2018-00608 (N.M. 1st Dist. Ct.), Centurion failed to timely report, diagnose, and treat sign of a broken collarbone, which resulted in the patient suffering lengthy, extended pain.

79.    The preceding cases and others illustrate Centurion's persistent refusal to refer inmate patients out to third-party medical providers for the provision of care unavailable through Centurion within NMCD's facilities.

80.    Upon information and belief, Centurion's widespread failure to refer prisoners for off-site medical care was, in large part, financially motivated, as Centurion was contractually obligated to pay $0.00 for any hospitalization lasting 24 hours or more. (Ex. 12).

81.    Upon information and belief, Centurion paid $0.00 for numerous prisoners' medical bills even though their hospitalizations were extensive. Evidently, this fee structure incentivized Centurion to refrain from referring prisoners for off-site care unless and until there was a substantial certainty that the prisoners would require more extensive hospital stays.

82.    The preceding cases, among others, also establish that Centurion was on notice of these widespread unconstitutional practices prior to Mr. Martinez's injuries and thereby knew or should have known that additional safeguards should have been put in place to address patients' signs of serious medical and mental health conditions.

83.     Accordingly, it can be inferred that Centurion intentionally failed to report, diagnose, and treat these serious warning signs despite the known and obvious risk to patient safety.

84.     Centurion's widespread practice of failing to report, diagnose, and treat the warning signs of serious medical and mental health conditions shares a close factual relationship with the events in Mr. Martinez's case, and accordingly, the widespread practice was the moving force behind his injuries and death.

85.     Significantly, Centurion personnel failed to conduct diagnostic and physical examinations at least seven times in Mr. Martinez's case alone,[2] which establishes a pattern and practice of insufficient reporting, diagnoses, and treatment of serious medical conditions.

86.     As such, Centurion's policy and practice of failing to report, diagnose, and treat warning signs of serious medical and mental health conditions proximately caused Mr. Martinez's injuries.

B.     Centurion had a pattern and practice of severely understaffing its medical and mental health facilities, which was a moving force behind Mr. Martinez's injuries.

87.     The fact of Centurion's chronic understaffing of medical positions during the time period leading up to Mr. Martinez's injuries is indisputable. It is widely known and documented. As emphasized in the October 23, 2018 New Mexico Legislative Finance Committee program evaluation of NMCD (the "Committee Report"): "Both state and contractor medical positions are frequently understaffed, threatening the quality of care provided. The Corrections Department's Office of the Medical Director, state employees who are responsible for overseeing the care,

---

[2] Centurion staff received notice of Mr. Martinez's severe pain and poor medical condition on the following days in 2018, yet they failed to conduct diagnostic and physical examinations: 9/12, 9/20, 9/23, 9/26, 10/8, 11/25, and 11/27.

opportunities, and education necessary for patients to improve their health, including medical provider contract oversight, had a 25 percent vacancy rate as of October 2018"—one month before Mr. Martinez's admission into intensive care. (Ex. 13 at 20-21).

88.    In particular, the Committee Report noted that "Centurion . . . struggled to recruit and retain staff, incurring fines of $1.1 million in each of the last two fiscal years for critical vacancies including dentists, licensed nurse practitioners, pharmacists, and medical directors." (*Id.* at 21).

89.    Centurion's pattern and practice of severe understaffing is a primary cause of the Constitutional violations concerning Mr. Martinez's medical treatment.

90.    Upon information and belief, Mr. Martinez was unable to receive adequate medical treatment due to the severe shortage of healthcare providers at the prison. Numerous important health protocols were violated, critical assessments and evaluations foregone, and reports missing in Mr. Martinez's file due to this severe staffing shortage, including the unfilled positions dedicated to oversight of medical services contract compliance. It was this lack of medical care and contract oversight that exacerbated Mr. Martinez's medical issues and eventually caused his injuries.

91.    Simply put, Mr. Martinez received little to no healthcare services largely because there were very few healthcare providers working in NMCD prisons in the months leading up to his injuries.

92.    Through the Committee Report and its own records of vacancies, Centurion was put on notice that this severe understaffing was substantially certain to cause Constitutional violations regarding its patients' medical treatment, yet it chose to disregard that risk and, for years,

continued to display a pattern and practice of severe shortages in medical staff and mental healthcare providers.

93.    In this way, Centurion acted with deliberate indifference to prisoners' healthcare needs. *See, e.g., Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (finding deliberate indifference to prisoners' healthcare needs where "gross deficiencies in staffing" and procedures cause the prisoner population to be "effectively denied access to adequate medical care").

C.    <u>Centurion also had a pattern and practice of failing to provide adequate medical documentation and failing to communicate changes in patient conditions, both of which contributed to Mr. Martinez's injuries.</u>

94.    Centurion failed to provide adequate medical documentation and failed to communicate changes in patient conditions for many other patients in circumstances similar to those of Mr. Martinez. For example, in *Jerry Sisneros v. Centurion et al.*, No. D-101-CV-2019-00598 (N.M. 1st Dist. Ct.), Centurion failed to adequately record vitals, which contributed to the patient's delayed diagnoses and treatment for diskitis and osteomyelitis.

95.    Additionally, Centurion has a pattern and practice of misplacing or otherwise failing to provide medical records for critical time periods leading up to the hospitalizations of its patients. For example:

- In *Calvin Finch v. Centurion et al.*, No. D-101-CV-2019-00778 (N.M. 1st Dist. Ct.), Centurion failed to provide medical records for the critical month leading up to Mr. Finch's hospitalization.

- In *Norman DeHerrera v. Centurion et al.*, No. D-101-CV-2020-02549 (N.M. 1st Dist. Ct.), Centurion failed to provide medical records for the 76 days immediately preceding Mr. DeHerrera's toe amputation.

Likewise, in Plaintiff's case, Centurion failed to provide medical records for the six weeks preceding Mr. Martinez's hospitalization and subsequent death.

96.     Notably, the Committee Report referenced an audit of Centurion released in June 2018 that put Centurion on notice that its charts fell short of industry best practices, and some charts were "illegible or inaccurate, not filled out and submitted timely, and not used consistently." (Ex. 13 at 22). The Committee Report also emphasized that documentation of certain test results was missing, and intake forms were not completed for all prisoners as required. (*Id.*).

97.     The preceding cases and report, among others, establish that Centurion was on notice of these widespread unconstitutional practices prior to Mr. Martinez's injuries and thereby knew or should have known that additional safeguards should have been put in place to address the inadequate medical documentation and communication of changes in patient conditions.

98.     Accordingly, it can be inferred that Centurion intentionally failed to adequately document patient conditions and failed to adequately communicate changes in those conditions despite the known and obvious risk to patient safety.

99.     Centurion's widespread practice of failing to provide adequate medical documentation and communicate changes in patient conditions shares a close factual relationship with the events in Mr. Martinez's case, and accordingly, the widespread practice was the moving force behind his injuries.

100.    Notably, Mr. Martinez's case alone reveals sufficient evidence of Centurion's widespread practice of providing inadequate medical documentation and communication about patient conditions. For example, in the months leading up to Mr. Martinez's hospitalization, medical staff failed to perform sufficient medical examinations and accompanying documentation at least seven times, in addition to providing no medical records for the six weeks preceding his hospitalization.

101.    Because Centurion personnel did not adequately document or otherwise communicate Mr. Martinez's rapidly deteriorating medical condition to the appropriate personnel, he was not provided with the medical treatment that he clearly needed, which caused him to sustain his injuries.

102.    Accordingly, Centurion's policy and practice of providing inadequate medical documentation and failing to communicate changes in patient conditions to appropriate personnel proximately caused Mr. Martinez's injuries.

D.    <u>Centurion failed to adequately train or supervise its individuals despite knowing that such training and discipline was necessary to protect patient health, and this failure was a moving force behind Mr. Martinez's injuries.</u>

103.    As outlined in the Committee Report, in 2018, the New Mexico Medical Review Association conducted an audit of Centurion's medical services in prisons and recommended that staff be better educated by both Centurion and NMCD on chart documentation standards and consistency and in completing prisoner intake forms correctly. (*Id.*). According to Centurion's auditors, the need for additional training and supervision was apparent and should have been prioritized.

104.    Similarly, the extensive violations of proper protocol in Mr. Martinez's case provide compelling evidence that Centurion had a widespread pattern and practice of failing to adequately train and supervise its personnel. As discussed in more detail above, Centurion medical staff failed to conduct necessary diagnostic and physical examinations in at least seven instances over the course of a few months as Mr. Martinez's medical condition worsened.

105.    As such, Centurion's widespread failures to train and supervise its personnel were a primary cause of the Constitutional violations suffered by Mr. Martinez. Each of Centurion's

failures to conduct necessary examinations deprived Mr. Martinez of the opportunity to be evaluated, diagnosed, and to be prioritized in receiving the medical treatment that he so desperately needed. Because medical personnel were not adequately trained or supervised to ensure that the proper medical procedures were followed, Mr. Martinez never received the opportunity to obtain additional medical services until his medical condition had become life threatening. Consequently, he sustained the injuries that resulted in his extensive hospital stay and death.

106.    Training and supervision regarding proper medical treatment protocol and documentation was required because, as Centurion knew or should have known to a moral certainty, Centurion's personnel would commonly confront situations where they would need to assess the severity and emergency nature of patients' medical conditions. This is the one of the primary tasks that these personnel were hired to do.

107.    Additionally, documenting and assessing the next steps in a patient's medical treatment is precisely the type of complex and important decision that requires training and supervision, as making the wrong choice in these instances will frequently cause the deprivation of prisoners' constitutional rights.

108.    As evinced by Mr. Martinez's situation and the others cited in subsection A of this section, Centurion's widespread pattern of deficient training and supervision presents an obvious potential to violate patients' Constitutional rights, because there has been a growing history where prisoners are denied serious medical care to which they are entitled, and they suffer from long-term disability or death as a result.

109.    Centurion was alerted to an obvious deficiency in its training and supervision through the many prior lawsuits against it alleging unconstitutional medical care. It was also put

25

on notice of these deficiencies through the 2018 audit results requiring that it provide better training and oversight of its personnel.

110.    Centurion's failure to do so is further evidence of its deliberate indifference to the Constitutional violations caused by its widespread deficiencies in training and supervising.

## IV.    DAMAGES SOUGHT

111.    As a direct result of Defendants' unlawful conduct, Mr. Martinez endured tremendous pain, injuries, anguish, suffering, and ultimately, death, which entitles his Estate to general and special compensatory damages by way of survival.

112.    Further, Plaintiff is entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, in addition to pre-judgment interest and costs as allowed by federal law.

113.    Plaintiff is also entitled to punitive damages against each of the Defendants, as their actions were done with malice or, minimally, with reckless indifference to Mr. Martinez's federally protected rights.

### CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
**8th and 14th Amendments to the U.S. Constitution
Deliberate Indifference to Serious Medical Need (42 U.S.C. § 1983)
(against Centurion, MHM, Dr. Gary French, PA Ellen Whittman, RN Erin Forsberg, CO
Archuleta, CO Palomino, CO Abate, CO Anthony Martinez, CO Ortiz, Day Shift L Pod
Control Officer, and Doe Doctors 1-2 in their individual capacities)**

114.    Each paragraph of this Complaint is incorporated as if fully restated herein.

115.    The abovenamed Defendants each possessed responsibility for the decisions that resulted in the violation of Mr. Martinez's constitutional right to be free from cruel and unusual punishment regarding the deliberate indifference to his serious medical needs while in NMCD custody, as described more fully above.

116.    These Defendants were aware of and deliberately disregarded the substantial risk of harm to Mr. Martinez that would ensue because of their failures to provide him with constitutionally adequate medical care, as described more fully above. Among other things, these Defendants were made aware of Mr. Martinez's substantial risk of harm due to his persistent expressions of intolerable and worsening pain, including chest pain specifically; his frail physical appearance; and his inability to digest foods and liquids for days.

117.    The deliberate indifference of the abovenamed Defendants caused Mr. Martinez to experience worsening, extensive, and unnecessary pain (first harm) and suffer from a delayed diagnosis of infective endocarditis (second harm), which resulted in a diagnosis of severe sepsis and acute encephalopathy due to central nervous system perivasculitis from the endocarditis (third harm). Ultimately, these harms resulted in Mr. Martinez's death (fourth harm).

118.    Mr. Martinez's harms were sufficiently serious injuries that a reasonable doctor or patient would find them important and worthy of immediate treatment. Without treatment, Mr. Martinez's worsening severe pain caused him to lose the ability to take care of his most basic needs so that he could not even stand or consume food and water. His subsequently diagnosed medical conditions were life-threatening, and they ultimately caused his death. Accordingly, Mr. Martinez's severe pain and medical conditions significantly affected his daily activities.

119.    The abovenamed Defendants are not shielded by qualified immunity for their deliberate indifference to Mr. Martinez's serious medical needs because of the well-documented 10th Circuit precedent notifying medical and prison personnel that the Eighth Amendment is violated when such personnel fail to take reasonable measures to provide a patient with access to medical attention and/or deny medical care to a patient with serious medical needs, as occurred in

Mr. Martinez's case with each of the Defendants named herein. *See, e.g., Sealock v. Colorado,* 218 F.3d 1205 (10th Cir. 2000) (confirming that prison personnel violate the Eighth Amendment when a prisoner complains of chest pain, a sign of medical emergency, yet prison personnel delay taking him to a hospital, even if the delay is only several hours).

<u>SECOND CLAIM FOR RELIEF:</u>
**8th and 14th Amendments to the U.S. Constitution**
**Conspiracy to Unlawfully Interfere with Medical Treatment (42 U.S.C. § 1983)**
**(against Centurion, MHM, Lovelace, Dr. Murray Young, Dr. James Bradley,**
**Dr. Vesta Sandoval, Vicki Bowers, Warden John Gay, and David Selvage in their**
**individual capacities)**

120.    Each paragraph of this Complaint is incorporated as if fully restated herein.

121.    The abovenamed Defendants each possessed responsibility for the decision to remove Mr. Martinez from life sustaining medical treatment, which resulted in the violation of Mr. Martinez's constitutional right to be free from cruel and unusual punishment regarding the deliberate indifference to his serious medical needs while in NMCD custody, as described more fully above.

122.    At the time that the abovenamed Defendants collectively decided to remove Mr. Martinez from life sustaining medical care, each of them knew that Mr. Martinez needed continued medical treatment in order to survive.

123.    Despite this shared knowledge, the abovenamed Defendants authorized Lovelace medical personnel to stop providing medical treatment to Mr. Martinez, thereby engaging in a conspiracy to kill Mr. Martinez without having the legal authority to do so and in violation of his constitutional rights.

124.    Accordingly, these Defendants unlawfully interfered with Mr. Martinez's medical treatment while being aware of and deliberately disregarding the substantial risk of harm to Mr.

Martinez that would ensue because of their failures to provide him with constitutionally adequate medical care.

125. The deliberate indifference of the abovenamed Defendants caused Mr. Martinez to die, thereby violating his Eight Amendment rights. *See, e.g., Estate of Marquette F. Cummings, Jr. v. Commissioner Kim Thomas, et al.,* No. 15 CV 02274 (S.D. Ala. Sept. 21, 2016), ECF No. 28 at 17-20 (finding sufficient Eighth Amendment claim where warden unlawfully authorized medical professionals to remove prisoner from life support).

126. In making the decision to let Mr. Martinez die, the abovenamed Defendants all acted in concert and came to an agreement through their discussions on January 11, 2018. Additionally, they all shared the same conspiratorial objective—to end Mr. Martinez's life rather than continue allowing him to receive medical treatment.

127. Because the abovenamed Defendants were acting outside the scope of their authority in making end-of-life medical decisions for Mr. Martinez, they are not entitled to the protections of qualified immunity. *See, e.g., Estate of Cummings v. Davenport*, 906 F.3d 934, 939 (11th Cir. 2018) (holding that warden was not entitled to qualified immunity for authorizing outside medical personnel to remove prisoner from life support because the applicable state law did not give him the discretionary authority to control a dying prisoner's end-of-life decisions).

128. Moreover, private companies and private employees are never entitled to qualified immunity, even when engaged in work delegated to them by the State. *See, e.g., Phillips v. Tiona*, 508 Fed. Appx. 737, 751-52 (10th Cir. 2013).

**THIRD CLAIM FOR RELIEF:**
**8th and 14th Amendments to the U.S. Constitution**
**Policy & Practice of Denial of Medical Care (42 U.S.C. § 1983)**
**(against Centurion)**

129.    Each paragraph of this Complaint is incorporated as if fully restated herein.

130.    As a private corporation acting pursuant to its agreement with NMCD to provide medical services to New Mexico State prisoners, Centurion was at all times relevant to the events described in this Complaint acting under color of law and, as the provider of healthcare services to prisoners incarcerated at PNM, was responsible for the creation, implementation, oversight, and supervision of all policies and procedures followed by employees and agents of Centurion and PNM/NMCD.

131.    Mr. Martinez's injuries were proximately caused by Centurion's policies and practices.

132.    Centurion maintains a policy, practice, and custom of under-reporting the severity of medical and mental health emergencies and denying appropriate medical and mental health care to prisoners. On information and belief, Centurion medical staff working in NMCD facilities are trained to ignore or under-report symptoms of medical and mental health emergencies, which amounts to deliberate indifference to the serious medical needs of prisoners presenting symptoms of such emergencies, including Mr. Martinez.

133.    On information and belief, Centurion supervises its employees to ignore or under-report symptoms of medical and mental health emergencies, which amounts to deliberate indifference to the serious medical needs of prisoners presenting symptoms of such emergencies, including Mr. Martinez.

134.    On information and belief, Centurion ratifies the conduct of its employees who

ignore or under-report symptoms of medical and mental health emergencies through review and approval of these employees' performance, and through the decision to continue the employment of such individuals who ignore and under-report medical and mental health emergencies of NMCD prisoners, which amounts to deliberate indifference to the serious medical needs of prisoners presenting symptoms of such emergencies, including Mr. Martinez.

135.    At all times relevant to this Complaint, Centurion had notice of a widespread practice by its employees and agents at PNM and NMCD facilities under which prisoners with serious medical conditions, such as Mr. Martinez, were routinely denied access to proper or sufficient medication and medical attention. Upon information and belief, it was common to observe prisoners of PNM and NMCD with clear symptoms of serious medical and/or mental concerns whose requests for medical care were routinely denied or completely ignored. Upon information and belief, a significant portion of these denials of medical and mental health care resulted in substantial injury or death.

136.    More specifically, there was a widespread practice under which employees and agents of Centurion and NMCD, including correctional officers and medical personnel, failed or refused to: (1) report, diagnose, and properly examine and treat prisoners with serious medical and/or mental health conditions, including failing to provide proper medications to prisoners with serious medical and/or mental health conditions; (2) respond to prisoners who requested medical and/or mental health services; (3) respond to prisoners who exhibited clear signs of medical and/or mental health need or illness; (4) adequately document and communicate the medical and mental health needs of prisoners to the appropriate correctional officers and/or medical or mental health staff; or (5) timely refer prisoners for emergency or other offsite medical services.

137.    Additionally, there was a widespread practice under which Centurion personnel severely understaffed its medical and mental health facilities and failed adequately to train and supervise its personnel on necessary medical and mental health procedures.

138.    These widespread practices were allowed to proliferate because Centurion directly encouraged, and was the moving force behind, the specific misconduct at issue. Centurion also failed to adequately train, supervise, and control correctional officers and medical personnel by failing to adequately punish and discipline prior instances of similar misconduct, thereby directly encouraging future abuses like those which harmed Mr. Martinez.

139.    Centurion knew of the substantial risk of serious or fatal consequences that could be caused by its unconstitutional policies, practices, customs, failures to train, and failures to supervise, as occurred in Mr. Martinez's case.

140.    Centurion is sued herein for maintaining these policies, practices, and customs; for failing to train and supervise; and for ratifying its employees' and agents' misconduct, all of which amounts to deliberate indifference to prisoners' serious medical and/or mental health needs.

141.    These policies and conduct were the moving force behind the violations of Mr. Martinez's constitutional rights and his injuries. Mr. Martinez's injuries were caused by employees and contractors of NMCD and Centurion, including but not limited to the individually-named Defendants, who acted pursuant to the policies and practices of Centurion while engaging in the misconduct described in this Complaint.

142.    Upon information and belief, Centurion maintained these policies and practices in order to maximize profit and without regard to its constitutional and medical obligations to NMCD prisoners who were entrusted to Centurion's care.

143.    Centurion is not shielded by qualified immunity for its unconstitutional policies and practices, because private companies and their private employees are never entitled to qualified immunity, even when employed doing correctional work. *See, e.g., Phillips v. Tiona*, 508 Fed. Appx. 737, 751-52 (10th Cir. 2013).

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief against Defendants, jointly and severally:

(a)    Monetary damages against Centurion and individual Defendants sued under 42 U.S.C. § 1983 in their individual capacities in an amount to be determined at trial to compensate Plaintiff for the injuries he sustained as a result of the events and conduct alleged herein;

(b)    Punitive damages against all Defendants in an amount to be determined at trial;

(c)    Statutory interest on any and all damages awarded to Plaintiff;

(d)    Reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

(e)    Such other and further relief as the Court may deem just and proper, including injunctive and declaratory relief.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues in this case so triable.

Dated: Albuquerque, New Mexico
        January 7, 2022

Respectfully submitted,

COLLINS & COLLINS, P.C.

By:   /s/ Parrish Collins
        Parrish Collins
        P.O. Box 506
        Albuquerque, NM 87103
        (505) 242-5958
        parrish@collinsattorneys.com

AND

GUEBERT GENTILE & PIAZZA P.C.

By: _/s/ Robert F. Gentile_____
Terry R. Guebert
Robert F. Gentile
Elizabeth M. Piazza
Julia H. Purdy
P.O. Box 93880
Albuquerque, NM 87199
(505) 823-2300
tguebert@guebertlaw.com
rgentile@guebertlaw.com
epiazza@guebertlaw.com
jpurdy@guebertlaw.com

*Attorneys for Plaintiff*