# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**EUGENIO MATHIS, as personal representative of
the ESTATE OF EFRAIN MARTINEZ, deceased,**

      **Plaintiff,**

**v.**                                    **No. Civ. 22-0020-JCH-KRS**

**CENTURION CORRECTIONAL HEALTHCARE OF
NEW MEXICO, LLC; MHM HEALTH PROFESSIONALS,
INC.; DR. GARY FRENCH; DR. MURRAY YOUNG;
THE ESTATE OF JAMES BRADLEY; DR. VESTA SANDOVAL;
PA ELLEN WHITMAN; RN ERIN FORSBERG;
WARDEN JOHN GAY; DAVEID SELVAGE; VICKI BOWERS;
CO ARCHULETA; CO PALOMINO; CO ABATE;
CO ANTHONY MARTINEZ; CO ORTIZ;
DAY SHIFT L POD CONTROL OFFICER; and
DOE DOCTORS 1-2,**

      **Defendants.**

## MEMORANDUM OPINION AND ORDER

      This matter comes before the Court on the *Motion to Dismiss for Failure to State a Claim and Based on Qualified Immunity and Supporting Memorandum* (ECF No. 28), filed by Defendants John Gay, David Selvage, Corrections Officers Archuleta, Palomino, Abate, Anthony Martinez, and Ortiz, and unidentified Pod Control Officer, collectively "NMCD Defendants." This case arises from the death of an inmate, Efrain Martinez ("Martinez"), while he was in the custody of the New Mexico Corrections Department ("NMCD"). According to Plaintiff Eugenio Mathis ("Plaintiff"), the personal representative of the Estate of Efrain Martinez, the NMCD Defendants and other named defendants were deliberately indifferent to and recklessly ignored Martinez's

symptoms of endocarditis and severe, increasing, and debilitating pain, and their failure to provide him with medical care and treatment consistent with applicable and prevailing standards of medical care caused him to spend 45 days in the hospital, and ultimately, caused his death. The Court, having considered the motion, briefs, first amended complaint and exhibits attached thereto, arguments, and relevant law, concludes that the motion to dismiss the first cause of action should be denied but the motion to dismiss the second cause of action against Defendants Gay and Selvage should be granted based on qualified immunity.

**I.      BACKGROUND**

Efrain Martinez was in custody of NMCD in the Penitentiary of New Mexico ("PNM") in Santa Fe, New Mexico, during the times relevant to this complaint. (First Am. Compl. ¶ 10, ECF No. 2.) NMCD contracted with Defendant Centurion to provide medical care to inmates in the NMCD prison system, and Defendant MHM contracted to supply medical personnel to Centurion to provide medical services to NMCD prisoners, including Martinez. (*Id.* ¶¶ 11-13.)

On September 11, 2018, Martinez submitted a health services request form, complaining to Centurion medical staff of intense heartburn that kept him up at night and was not improved by over-the-counter antacids. (*Id.* ¶ 33.) The next day, Doe Doctor One saw Martinez and diagnosed him with heartburn without a physical examination, testing, or treatment. (*Id.* ¶ 34.) Martinez submitted two additional health services request forms on September 20 and 23, 2018, again for his "heart burn or ulcer" that was worsening, horrible, and hurt so much he could not sleep. (*Id.* ¶ 35.) In response, Doe Doctor Two scheduled him for a medical appointment with a physician's assistant on October 8, 2018. (*Id.* ¶ 36.) On September 25, 2018, Defendant RN Erin Forsberg gave him two Tums on September 25, 2018, but did nothing to expedite his appointment, despite knowing that his chest pain was worsening and so severe it interfered with his sleep. (*Id.* ¶ 37.)

Prior to September 2018, Martinez was extremely physically fit and muscular, but beginning in September 2018, his physical condition was noticeably and rapidly deteriorating. (*See id.* ¶¶ 33-38.) He became very thin in only a matter of weeks and stopped his daily exercise activity in the yard. (*Id.* ¶ 38.)

Defendant Correctional Officers ("COs") Archuleta, Palomino, Abate, and Anthony Martinez were the four main dayshift pod officers assigned to the PNM L Pod in and around the months of September to December 2018, and they were responsible for Martinez's care and safety. (*Id.* ¶ 28.) They conducted daily rounds of Martinez's cell three times a day from September through December 2018, and they saw him in his cell and in the day room during "Tier Time" (Day Room "free" time) at least once during each of their shifts. (*Id.* ¶ 40.) One of their duties was to pat down Martinez each day when he left his cell for Tier Time, so they each would have noticed his visibly ill state and witnessed his rapid decline during each of their work shifts. (*Id.*)

CO Ortiz and unidentified Day Shift L Pod Control Officer ("UI CO") were the two main day-shift control officers assigned to the PNM L Pod from September to December 2018. (*See id.* ¶¶ 29-30.) Because their duties included overseeing Martinez's cell, they observed Martinez in his cell and in the Day Room during each of their shifts through high-resolution surveillance cameras. (*Id.* ¶ 41.) Consequently, CO Ortiz and UI CO were on notice of his visibly ill state, and they also witnessed his rapid decline during each of their work shifts. (*Id.*) Defendants Archuleta, Palomino, Abate, Anthony Martinez, Ortiz, and UI CO all observed Martinez's rapidly deteriorating condition beginning in September 2018, but they did nothing to ensure Martinez was given a proper medical evaluation in a timely manner. (*Id.* ¶ 39.)

On October 8, 2018, Defendant PA Ellen Whittman diagnosed Martinez with indigestion and prescribed the same over-the-counter antacids that she knew had been ineffective. (*Id.* ¶¶ 42-

43.) From October 8, 2018, to November 25, 2018, Martinez received no additional medical attention despite his worsening condition and repeated pleas for medical assistance to alleviate his severe chest pain. (*See id.* ¶ 44.) Near the end of October 2018, Martinez physically deteriorated even more rapidly. (*Id.* ¶ 45.) His face was pale, his cheeks were dramatically sunken in, he lost almost all his body mass, and he appeared very physically weak. (*Id.*)

Beginning in mid-November 2018, Martinez stopped eating all or most meals, and on November 23, 2018, he began regurgitating all fluids and foods he tried to consume. (*Id.* ¶ 46.) The smell and sight of vomit and rotting meals remained in his cell during the last week of November 2018, and he stopped leaving his cell and would not socialize in the yard or Day Room. (*Id.*) The NMCD Defendants were aware of his poor health by witnessing his physical deterioration and seeing the condition of his cell. (*See id.* ¶ 47.) That last week, Martinez's cell neighbor, Johnathan Sanchez, submitted a health services request form for Martinez because he was so worried about his poor health. (*Id.* ¶ 49.)

On November 25, 2018, Martinez submitted another health services request form saying he was "very weak," "very ill," not able to ingest liquid or food for a few days, and in need of medical attention "A.S.A.P." (*Id.* ¶ 50.) The next day, on November 26, 2018, he fainted in his housing unit and had to be carried by fellow prisoners. (*Id.* ¶ 51.) Only then did Defendant Forsberg transfer him to the medical unit where he remained until November 27, 2018, when his symptoms, including high fever, nausea, back pain, headache, blurry vision, and inability to keep fluids down, prompted Defendant Dr. Gary French to send him to the emergency room of Christus St. Vincent Regional Medical Center. (*See id.* ¶¶ 51-55.) He was diagnosed with acute bacterial endocarditis (infection of the inner layer of the heart); acute aortic regurgitation (leaking heart chamber); severe thrombocytopenia (low blood platelet count); and severe sepsis. (*Id.* ¶ 61.) On November 29, 2018,

medical personnel transferred Martinez to Lovelace Medical Center to undergo cardiothoracic surgery. (*See id.* ¶¶ 60, 63.)

On January 8, 2019, Martinez's condition continued to worsen, and he was diagnosed with severe sepsis, septic shock, and renal and respiratory failure, among other things. (*Id.* ¶ 65.) On January 11, 2019, Lovelace medical providers, including Dr. James Bradley, spoke with Dr. Murray Young, a Centurion/NMCD regional medical director; John Gay, the PNM Warden; and David Selvage, NMCD Health Services Administrator/Manager, about whether to remove Martinez from life support. (*Id.* ¶ 66.) Lovelace medical staff deemed Martinez incurable, and everyone agreed with comfort measures and withdrawal of care. (*See id.* ¶¶ 69, 74.) Without consulting Martinez's family, who were visiting him in the hospital daily at the time and were vehemently opposed to removing life support measures, Defendants Young, Gay, and Selvage directed Lovelace medical providers to remove him from life support. (*Id.* ¶¶ 67, 73.) Lovelace subsequently provided Martinez only with comfort measures to ease him into death, and he passed away on January 11, 2019. (*Id.* ¶¶ 74-75.)

Plaintiff alleges two causes of action involving the NMCD Defendants.[1] In his First Claim for Relief, Plaintiff asserts that NMCD Defendants Archuleta, Palomino, Abate, Anthony Martinez, Ortiz, and UI CO, in their individual capacities, were deliberately indifferent to Martinez's serious medical needs in violation of the Eighth and Fourteenth Amendments. (First Am. Compl. 27-28, ECF No. 2.) Plaintiff contends in his Second Claim for Relief that Defendants Gay and Selvage, in their individual capacities, along with other named defendants, conspired to

---

[1] Plaintiff asserts claims against other entities and medical personnel as well. In the first count, Plaintiff also named as Defendants Centurion, MHM, Dr. Gary French, PA Ellen Whittman, RN Erin Forsberg, and Doe Doctors 1-2. (First Am. Comp. 27, ECF No. 2.) In the second cause of action, Plaintiff additionally named as Defendants Centurion, MHM, Lovelace, Dr. Murray Young, Dr. James Bradley, Dr. Vesta Sandoval, and Vicki Bowers. (*Id.* at 28.) Plaintiff asserts a third claim for relief against only Defendant Centurion for a policy and practice of denying medical care in violation of the Eighth and Fourteenth Amendments that caused Martinez's injuries. (*See id.* at 30-33.) Defendant Lovelace Health System was subsequently dismissed under Rule 41. (*See* Order, ECF No. 40.)

unlawfully interfere with Martinez's medical treatment in violation of the Eighth and Fourteenth Amendments. (*Id.* at 28-30.) The conspiracy claim is based on the decision to remove Martinez from life sustaining medical treatment that he needed to survive, causing his death, without having legal authority under state law, N.M. Stat. Ann. § 24-7A-5, to do so. (*Id.* at 17, 28-30.)

## II.    STANDARD

For a party to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). A complaint that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" is insufficient to state a claim for relief. *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A plaintiff must allege either direct or inferential allegations on all the material elements of a claim and provide enough factual allegations for a court to infer the claim is plausible. *See Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008). Conclusory allegations without supporting factual allegations are insufficient to state a claim. *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)). A plaintiff need only allege enough facts to make her claim plausible on its face and provide fair notice to the defendant. *Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013).

Section 1983 provides that every person who, under color of law, subjects any person to a deprivation of federal or constitutional rights "shall be liable to the party injured in an action at law…." 42 U.S.C. § 1983. Because the common law at the time of the statute's enactment recognized certain immunities for government officials, the Supreme Court recognizes similar immunities under § 1983, one of which is qualified immunity. *See Filarsky v. Delia*, 566 U.S. 377, 383-90 (2012). Qualified immunity shields government officials performing discretionary

functions from liability for civil damages so long as their conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known. *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

To defeat a qualified immunity defense, the plaintiff must both "demonstrate that the defendant's actions violated a constitutional or statutory right" and "show that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue." *Archuleta v. Wagner*, 523 F.3d 1278, 1283 (10th Cir. 2008). A court may exercise its discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first based on the circumstances of the case before it. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). For a right to be clearly established under the second prong, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). A plaintiff can demonstrate that a constitutional right is clearly established by references to on-point cases from the Supreme Court, the Tenth Circuit, or the clearly established weight of authority from other circuits. *Archuleta*, 523 F.3d at 1283.

## III.    ANALYSIS

### A. First Claim for Relief – Deliberate Indifference to Serious Medical Needs in Violation of the Eighth and Fourteenth Amendments[2]

Plaintiff's constitutional claims are asserted pursuant to 42 U.S.C. § 1983, the "remedial

---

[2] Plaintiff asserts claims under the Eighth Amendment and under the Fourteenth Amendment, but only invokes the latter amendment because the Due Process Clause of the Fourteenth Amendment incorporates the Eighth Amendment's guarantee against cruel and unusual punishment. (*See* Pl.'s Resp. 4-6, ECF No. 32 (and cited cases).) Plaintiff is thus not attempting to allege a separate substantive Fourteenth Amendment claim, so the Court will limit its analysis to whether Plaintiff stated a claim under the Eighth Amendment. (*See id.*)

vehicle for raising claims based on the violation of [federal] constitutional rights." *Brown v. Buhman*, 822 F.3d 1151, 1161 n.9 (10th Cir. 2016). "Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir.1997)). There must be a connection between the official's conduct and the constitutional violation. *Id.*

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). Deliberate indifference has both an objective and subjective component. *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006). The objective component of the test is met if the harm suffered was sufficiently serious. *Id.* The Tenth Circuit has described the objective component as incarceration under "'conditions posing a substantial risk of serious harm' to inmate health or safety." *DeSpain v. Uphoff*, 264 F.3d 965, 973 (10th Cir. 2001) (quoting *Farmer*, 511 U.S. at 834).

The subjective component requires a showing that the defendant acted with a culpable state of mind. *See Farmer*, 511 U.S. at 836. In *Farmer v. Brennan*, the Supreme Court observed that the required *mens rea* lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other ...." *Id.* The *Farmer* Court held that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. The Supreme Court made clear that the

defendant's knowledge of a substantial risk of serious harm may be proven by circumstantial evidence, including evidence "that the risk was obvious." *Id.* at 842. Mere negligence is not enough to constitute deliberate indifference. *Smith v. Cummings*, 445 F.3d 1254, 1258 (10th Cir. 2006).

The NMCD Defendants argue that Plaintiff cannot establish the subjective component necessary to state a claim, and thus the first cause of action must be dismissed against Defendants Archuleta, Palomino, Abate, Anthony Martinez, Ortiz, and UI CO.[3] The NMCD Defendants contend that they were clearly not medical professionals and were not responsible for Martinez's medical treatment. According to the NMCD Defendants, there are no non-conclusory factual allegations from which to reasonably infer that any of them were aware that a serious risk of harm existed for Martinez or that they drew such an inference.

The Court disagrees and finds that Plaintiff alleged numerous non-conclusory factual allegations that plausibly state a claim for an Eighth Amendment violation for the first claim. According to the first amended complaint, on or around September 25, 2018, Martinez's physical condition was noticeably and rapidly deteriorating—he became very thin in a matter of weeks and stopped exercising as was his daily activity. (*See* First Am. Compl. ¶¶ 37-38, ECF No. 2.) By the end of October 2018, Martinez's "severe illness became extremely apparent, as his face was pale, his cheeks were dramatically sunken in, and he lost almost all of his body mass." (*Id.* ¶ 45.) "He appeared very physically weak, a dramatic shift from his muscular appearance just a few months prior." (*Id.*) On or about November 23, 2018, Martinez began regurgitating all fluids and foods, such that the smell and sight of his vomit and rotting meals remained in his cell during the last week of November 2018. (*Id.* ¶ 46.) Martinez stopped leaving his cell, no longer socializing in the

---

[3] Defendants in their motion do not address the objective component of the claim. (*See* Defs.' Mot. 7, ECF No. 28 ("This Motion focuses on the subjective, not the objective component…."); Defs.' Reply 3 n.1, ECF No. 35.) The Court will likewise limit its analysis to the subjective prong.

yard or day room. (*Id.*) The NMCD Defendants "were aware of Mr. Martinez's poor physical state through witnessing this physical deterioration and seeing and/or smelling his vomit and the rotting, uneaten food in his cell." (*Id.* ¶ 47.)

Plaintiff alleged more than merely conclusory allegations necessary for individual liability against each named officer. He asserted that Archuleta, Palomino, Abate, and Anthony Martinez were the four main dayshift pod officers assigned to the PNM L Pod in and around the months of September to December 2018, and they saw him daily. (*See id.* ¶¶ 28, 40.) CO Ortiz and UI CO were the two main dayshift control officers assigned to the PNM L Pod from September to December 2018, and they would have observed Martinez through high-resolution surveillance cameras during each of their shifts. (*Id.* ¶¶ 29, 30, 41.) Martinez's cell neighbor submitted a health services request form on Martinez's behalf the last week of November 2018 because he was so worried about Martinez's poor health, from which an inference can be made that Martinez's physical deterioration and need for medical care was obvious even to persons without medical training. (*See id.* ¶ 49.) Yet, Martinez did not receive any medical attention after October 8, 2018, through November 25, 2018, despite his worsening condition, and only was taken to the medical unit after fainting in his housing unit on November 26, 2018. (*See id.* ¶¶ 44, 50-51.) A reasonable inference could be made from the facts alleged that the named Defendants were aware of the substantial risk of serious harm to Martinez from failing to provide medical care based on his frail physical appearance, substantial weight loss, and obvious physical deterioration, a conclusion that a lay person without medical training could reach, even without knowing a specific diagnosis. *Cf. Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005) (explaining that, if risk is so obvious, a jury could infer that defendant did in fact realize it); *Sealock v. Colorado*, 218 F.3d 1205, 1208, 1210-11 (10th Cir. 2000) (reversing summary judgment in favor of correctional sergeant on Eighth

Amendment claim for delay of medical treatment where inmate told sergeant he was having chest pain and it might be a heart attack, but sergeant said he could do nothing for him because no one was at clinical services, it was snowing, and would take an hour to warm the van). *See also Kellum v. Mares*, 657 F. App'x 763, 770 (10th Cir. July 25, 2016) ("the relevant question is the *risk* of substantial harm, not whether the official knew of the specific medical condition causing the symptoms presented by the prisoner") (emphasis in original); *Kikumura v. Osagie*, 461 F.3d 1269, 1296 (10th Cir. 2006) (overruled on other grounds) ("Moreover, given that Mr. Kikumura's health had 'rapidly deteriorated,' it is possible that even a lay person could have recognized a change in circumstances necessitating emergency medical treatment. In light of these allegations, we do not believe that the Correctional Officers' lack of medical training necessarily defeats the inference that they disregarded a known risk of serious harm to Mr. Kikumura."). Assuming the truth of the allegations, a jury could reasonably infer that the NMCD Defendants drew the inference that a substantial risk of serious harm existed, given that Plaintiff alleges that Martinez's symptoms were obviously severe based on his rapidly and outwardly noticeable physical deterioration.

The NMCD Defendants nonetheless argue that they had no basis to infer a serious risk of harm existed because Martinez was receiving medical care. "A prisoner may satisfy the subjective component by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of her condition. Even a brief delay may be unconstitutional." *Mata*, 427 F.3d at 755. The gatekeeper theory holds that a prison official who prevents an inmate from receiving medical treatment or denies access to someone capable of evaluating the inmate's need for treatment satisfies the subjective component of an Eighth Amendment claim. *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1137 (10th Cir. 2023). That Plaintiff received some care between September 12, 2018, and October 8, 2018, does not insulate the NMCD Defendants

from liability for failing to provide care after October 8, 2018, and until November 26, 2018, when

his condition noticeably deteriorated in the interim, according to the allegations. As the Tenth

Circuit explained in *Lucas*:

> [I]n the gatekeeping context, where some medical care is present, this court has still
> evaluated it for sufficiency and whether it is the functional equivalent to a complete
> denial of care. In *Estate of Jensen by Jensen v. Clyde*, a jail nurse who provided
> Gatorade instead of referring a patient for serious stomach problems completely
> failed to fulfill the gatekeeper role. 989 F.3d 848, 860 (10th Cir. 2021)…
>
> Accordingly, it is possible to have some medical care and still state a claim under
> the gatekeeper theory. This makes obvious sense. The inquiry under a gatekeeper
> theory is not whether the prison official provided *some* care but rather whether they
> fulfilled their sole obligation to refer or otherwise afford access to medical
> personnel capable of evaluating a patient's treatment needs when such an obligation
> arises. *See Sealock*, 218 F.3d at 1211; *Mata*, 427 F.3d at 751–61….
>
> To summarize, doing nothing in the face of serious medical needs is obviously
> sufficient to state a claim under both theories. *See Mata*, 427 F.3d at 758. However,
> merely doing *something* (with no reference to the underlying condition) does not
> necessarily insulate one from liability. Instead, a court may need to determine
> whether there was the functional equivalent of a complete denial of care in light of
> the specific circumstances… Should Defendants' view prevail, every institutional
> doctor or gatekeeping official could shield themselves from constitutional liability
> by simply prescribing any mild over-the-counter pain reliever, regardless of
> symptoms. Such a literal inquiry into whether there was a complete denial of care
> is not the standard.

*Id.* at 1138-39.

Plaintiff alleges that he did not receive any medical care after October 8, 2018, until

November 26, 2018, even though his physical health deteriorated noticeably and drastically during

this period. (*See* First Am. Compl. ¶¶ 44-51, ECF No. 2.) By the end of October 2018, his severe

illness became extremely apparent, as he lost almost all of his body mass and was very physically

weak – a dramatic change from his muscular appearance a few months prior. (*Id.* ¶ 45.) On

November 23, 2018, he began regurgitating all fluids and food, with the sight and smell of his

vomit obvious, yet care was delayed until November 26, 2018. (*See id.* ¶¶ 46-51.) Also, on or

about November 21 or 22, 2018, Martinez began experiencing constant, severe symptoms of sharp, throbbing, 10/10 pain. (*See id.* ¶¶ 54, 58, ECF No. 2.) Plaintiff alleged sufficient facts that each of the named NMCD Defendants observed him daily, witnessing the worsening of his condition, and yet failed to send him for additional medical care for weeks or days. Accordingly, Plaintiff alleged enough facts to plausibly state an Eighth Amendment claim for deliberate indifference to a serious medical need for relief against each NMCD Defendant named in the first claim for relief. *Cf. Kikumura*, 461 F.3d at 1296 (explaining that delay by correctional officers of three and a half hours before calling infirmary, when they knew inmate needed emergency medical treatment, was more than sufficient to survive motion to dismiss because even a brief delay may be unconstitutional).[4]

The Court also concludes that the NMCD Defendants are not entitled to qualified immunity on this claim because the law was clearly established at the time that deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment. *See Mata*, 427 F.3d at 749 ("there is little doubt that deliberate indifference to an inmate's serious medical need is a clearly established constitutional right"). A jury could draw a reasonable inference from Plaintiff's non-conclusory factual allegations that the NMCD Defendants were aware of facts that a substantial risk of harm to Martinez's health existed: they knew from his extreme weight loss and gaunt appearance and, later, his regurgitating all food and fluids, that he needed medical care; and they disregarded this excessive risk by failing to take him to the medical unit for treatment when needed, delaying his treatment. *Cf. Estelle*, 429 U.S. at 104-05 (deliberate indifference is manifested by prison personnel "in intentionally denying or delaying access to medical care"). Prior to 2018, it

---

[4] Plaintiff additionally alleged in the complaint that from October 8, 2018, to November 25, 2018, Martinez repeatedly pleaded for medical assistance to alleviate his severe chest pain. (First Am. Compl. ¶ 44, ECF No. 2.) Plaintiff, however, failed to allege to whom Martinez asked for medical assistance. Plaintiff notes that he requested Martinez's entire medical record, but Plaintiff received no records for this period. (*Id.* ¶ 44 n.1.) Because Plaintiff has not alleged that he asked for medical assistance from one or more of the named NMCD Defendants, the Court will not presume such or rely on the allegation as to the NMCD Defendants. However, as explained herein, there are enough other facts to state a plausible claim to survive the motion to dismiss.

was clearly established that when an inmate has obvious and serious medical needs, ignoring those needs violates the inmate's clearly established constitutional rights. *Cf. Quintana v. Santa Fe County Board of Commissioners*, 973 F.3d 1022, 1033 (10th Cir. 2020) ("Thus, prior to January 2016, it was clearly established that when a detainee has obvious and serious medical needs, ignoring those needs necessarily violates the detainee's constitutional rights. Officer Chavez's inaction in the face of Ortiz's bloody vomiting therefore violated clearly established law."); *Blackmon v. Sutton*, 734 F.3d 1237, 1245-46 (10th Cir. 2013) ("Long ago, *Estelle* cited favorably *Westlake v. Lucas*, 537 F.2d 857 (6th Cir.1976), a case in which prison staff did provide an inmate with mild antacids in response to a badly bleeding ulcer but failed to provide him with access to obviously needed medical care for what was clearly a life-threatening condition. The denial of meaningful access to care and the delay in doing so was, the court found, enough to suggest conscious disregard of a substantial risk of serious harm."). The case law was sufficiently clear to make it apparent that the conduct, as alleged, was unlawful. *See Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015) (to overcome qualified immunity, plaintiff does not need a perfectly on-point case, but preexisting law must make unlawfulness of defendant's conduct apparent). Consequently, the Court will deny Defendants' motion to dismiss Plaintiff's first cause of action against the NMCD Defendants named therein.

**B. Second Claim for Relief—Conspiracy to unlawfully interfere with medical treatment in violation of the Eighth and Fourteenth Amendments**

In Plaintiff's second claim for relief, he asserts that on January 11, 2019, PNM Warden John Gay and David Selvage, the NMCD Health Services Administrator/Manager, conspired with other named Defendants, including Lovelace medical personnel, to unlawfully interfere with medical treatment by collectively deciding to remove Martinez from life sustaining medical care, even though they knew he needed continued medical treatment in order to survive and did not have

the legal authority under state law to stop providing treatment. (*See* First Am. Compl. ¶¶ 26-27, 121-123, ECF No. 2.) According to the complaint, none of the Defendants involved in the decision consulted with Martinez, his lawful surrogate/agent/guardian, or his family, even though his family was visiting him in the hospital daily and vehemently opposed removing life support measures. (*Id.* ¶¶ 66-73.)

Defendants Gay and Selvage first argue that the evidence attached to Plaintiff's First Amended Complaint negates a conspiracy claim and that Plaintiff failed to state a viable § 1983 conspiracy claim. This Court need not reach those initial arguments, because it concludes that Defendants' last argument has merit – that it was not clearly established that a prison official can be held liable under a civil rights conspiracy theory when relying on the professional judgment of contracted medical providers for when to remove life support measures.

According to Defendants, the clearly established law in the Tenth Circuit is that a prison official violates the Eighth Amendment when he intentionally interferes with prescribed medical treatment, but that, here, there are no allegations that Defendants Gay and Selvage ordered the withdrawal of life support contrary to a prescription for continued care. Instead, according to the allegations and medical documents attached to the First Amended Complaint, medical professionals advised against the continuation of life-sustaining care after consultation with multiple doctors and risk management personnel. Defendants Gay and Selvage allegedly directed the withdrawal of life support in accordance with those opinions of the medical professionals. Defendants thus argue that the allegations do not violate clearly established law in the Tenth Circuit.

In response, Plaintiff argues that Defendants Gay and Selvage "are not entitled to any consideration of qualified immunity because they were acting outside the scope of their authority

15

in making end-of-life medical decisions for Mr. Martinez." (Pl.'s Resp. 21, ECF No. 32.) Plaintiff relies on the Eleventh Circuit case of *Estate of Cummings v. Davenport*, 906 F.3d 934 (2018), to support his argument that Defendants' conduct violated the Eighth Amendment, and that they are not entitled to the qualified immunity defense. In *Cummings*, a prison inmate was stabbed by another inmate, transported to the hospital, and died after hospital personnel removed him from life support based on a written instruction from the warden to take no heroic measures to save his life. *Id.* at 937-38. The decedent's estate sued the warden under § 1983, asserting that he violated Cummings's Eighth and Fourteenth Amendment rights by illegally interfering with his end-of-life medical care with deliberate indifference to his serious medical needs. *Id.* at 937. The Eleventh Circuit affirmed the district court's ruling that the warden was not entitled to qualified immunity because he failed to establish that his alleged actions fell within the scope of his discretionary authority, a threshold burden for a defendant invoking the qualified immunity defense. *Id.* Looking to state law to determine the scope of the state official's discretionary authority, the Eleventh Circuit concluded that the Alabama Natural Death Act, Ala. Code § 22-8A-1 *et seq.*, did not empower a prison warden to enter a do-not-resuscitate order or to withdraw life support without a court order first appointing the warden a guardian for the inmate. *Id.* at 940-42.

The Eleventh Circuit's decision is based on Supreme Court precedent generally stating that government officials performing discretionary functions are shielded from liability for civil damages for conduct that does not violate clearly established statutory or constitutional rights of which a reasonable person would know. *See id.* at 939-40 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *id.* at 943 (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 150 (2017) ("[g]overnment officials are entitled to qualified immunity with respect to '*discretionary functions' performed in their official capacities*"). In the Eleventh Circuit, when asserting a qualified immunity defense,

16

the defendant bears the initial burden to show that he acted pursuant to the performance of his duties and that his actions were within the scope of his authority. *Id.* at 940. The burden does not shift to a plaintiff to establish that the defendant violated clearly established law until the defendant shows that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. *Id.* Because the Eleventh Circuit in *Davenport* decided the case on the threshold elements of the qualified immunity defense, it did not reach on interlocutory appeal whether the amended complaint stated a constitutional claim or whether the law was clearly established. *See id.* at 943-44. *Davenport* is thus only helpful to Plaintiff if the Tenth Circuit likewise applies the threshold requirements as part of its qualified immunity analysis.

Problematically for Plaintiff, the *Davenport* court acknowledged that not every circuit has adopted the discretionary-authority requirement in its qualified-immunity analysis, specifically citing as contrary authority the Tenth Circuit case of *Stanley v. Gallegos*, 852 F.3d 1210 (10th Cir. 2017). *See Davenport*, 906 F.3d at 943. It also noted that "the Supreme Court has never addressed the scope of an official's burden to establish that a suit against him is based on actions taken within his authority." *Id.* at 943. *Davenport* itself thus undermines Plaintiff's argument as to the case's import in this circuit.

Turning then to the law in this circuit, the Tenth Circuit in *Stanley* addressed whether a public officer loses the protection of qualified immunity when he acts outside the scope of his authority. In that case, the plaintiff erected a fence and locked gate across a road through his property to prevent public access through his land to a popular hunting and wildlife area in northern New Mexico. *Id.* at 1212. The district attorney forcibly removed the barrier, despite a still-pending quiet-title action filed by the plaintiff in state court to determine whether the road was private or public. *Id.* After the plaintiff filed suit under § 1983 for violation of his Fourth, Fifth, and

17

Fourteenth Amendment rights arising from the unlawful seizures of his personal property and creating a public right-of-way without due process of law, the district attorney moved for summary judgment based on qualified immunity. *Id.* The district court denied the motion, endorsing the scope-of-authority exception to qualified immunity and concluding that the district attorney clearly acted without state-law authority in forcibly removing the barrier. *Id.* The Tenth Circuit panel reversed and remanded for further proceedings to determine whether the defendant violated clearly established federal law or was instead entitled to qualified immunity, but the panel divided on the grounds for doing so. *See id.* at 1211-12.

Judge Hartz, the author of the *Stanley* opinion, avoided recognition of the scope-of-authority exception, and stated that, if the circuit adopted the scope-of-authority exception, it should only apply in cases where there was clearly established state law that the official's actions exceeded the scope of authority. *Id.* at 1212, 1216. Judge Hartz then concluded that, because New Mexico law did not clearly establish that the defendant exceeded his authority as district attorney, the scope-of-authority exception would not apply. *See id.* at 1216-19. In contrast, Judge Holmes refused to recognize a scope-of-authority exception to qualified immunity, and instead ruled that the district court erred in applying the exception because Supreme Court and Tenth Circuit precedent do not apply a threshold inquiry to the traditional two-part qualified immunity analysis. *See id.* at 1211, 1219-28. Judge Matheson concurred in the result to remand for the district court to consider the qualified immunity defense. *See id.* at 1228. Judge Matheson deferred deciding whether to adopt a scope-of-authority test and the contents thereof. *Id.* Because the parties before the panel both used the Fourth Circuit's test, Judge Matheson determined the case should be resolved using that test – that an official may claim qualified immunity so long as his actions were not clearly established to be beyond the bounds of his discretionary authority. *Id.* (quoting *In re*

*Allen*, 106 F.3d 582 (4th Cir. 1997)). Agreeing with Judge Hartz that New Mexico law did not clearly establish that the defendant's actions exceeded his authority as district attorney, he remanded for the district court to consider the qualified immunity issue. *Id.*

Both Judge Hartz and Judge Holmes addressed the importance of the Supreme Court case of *Davis v. Scherer*, 468 U.S. 183 (1984), when considering the scope-of-authority exception. In *Davis*, a § 1983 case for unlawful termination of employment, the "Supreme Court rejected the plaintiff's argument that the defendants were not entitled to qualified immunity because they failed to comply with a state regulation governing employee discharges." *Stanley*, 852 F.3d at 1214-15 (citing *Davis*, 468 U.S. at 193-96). As the Supreme Court in *Davis* explained, if officials lost their qualified immunity because their conduct violated some statutory or administrative provision, "officials would be liable in an indeterminate amount for violation of any constitutional right— one that was not clearly defined or perhaps not even foreshadowed at the time of the alleged violation—merely because their official conduct also violated some statute or regulation. And, in § 1983 suits, the issue whether an official enjoyed qualified immunity then might depend upon the meaning or purpose of a state administrative regulation, questions that federal judges often may be unable to resolve on summary judgment." *Davis*, 468 U.S. at 194-95. Accordingly, the Supreme Court held that a "plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that those rights were clearly established at the time of the conduct at issue." *Id.* at 197.

For Judge Hartz, the lesson of *Davis* is that, because the focus of § 1983 is federal, not state, law, qualified immunity should not depend on whether the government employee complied with state law, but rather whether the federal rights in question were clearly established at the time of the conduct at issue. *See Stanley*, 852 F.3d at 1214-15. Judge Hartz's reading of *Davis* caused

him to be circumspect before embracing a scope-of-authority exception because of the difficulty in "how to draw the line between conduct that *violates* state law (which *Davis* said is irrelevant to qualified immunity) and conduct that *is unauthorized by state law* (which is the purview of the scope-of-authority exception)." *Id.* at 1215 (emphasis in original). Judge Holmes likewise viewed *Davis* as significant to the analysis, but unlike Judge Hartz, he rejected the scope-of-authority exception outright as a violation of Supreme Court precedent that imposes a federally focused qualified-immunity standard. *See id.* at 1221-24.

Prior to *Stanley*, no binding precedent of the Tenth Circuit had adopted the scope-of-authority exception to qualified immunity. *Id.* at 1215. *Stanley* itself deferred in recognizing it. *See id.* at 1228. This Court's research did not reveal a decision post-*Stanley* adopting a scope-of-authority exception in this circuit. Rather, the Tenth Circuit subsequently cited approvingly Judge Holmes' concurrence in explaining that an official's violation of state law does not necessarily deprive him of qualified immunity from liability under federal law. *See Cummings v. Dean*, 913 F.3d 1227, 1243 (10th Cir. 2019) (quoting *Stanley*, 852 F.3d at 1224, for Judge Holmes' explanation that "*Davis* forecloses the argument that 'if an official acts outside of his scope of authority, as defined by clearly established *state* law, he 'forfeits' his right to have a federal court in a § 1983 action consider the merits of his defense that his actions did not violate clearly established *federal* law'"). Nor has Plaintiff cited a Tenth Circuit case adopting the scope-of-authority exception. This Court is bound by Tenth Circuit precedent. That precedent limits this Court's determination of the qualified immunity analysis to whether the defendant violated a constitutional or federal right and whether that violation was clearly established. *See Stanley*, 852 F.3d at 1215, 1225-27 (and cited cases). Consequently, the Court finds that *Davenport*'s analysis is not binding law in this circuit, and that the Tenth Circuit has yet to recognize a threshold scope-

of-authority analysis before turning to the two-prongs of the qualified immunity defense.

Thus, once the qualified immunity defense is raised, the plaintiff has the burden of directing the court to Supreme Court or Tenth Circuit authority finding a defendant liable under federal law in factually similar circumstances. *Cummings*, 913 F.3d at 1243. In this case, Plaintiff had a burden to identify a precedential case, or a clear weight of authority from other circuits, where a government official in a similar position was held liable under federal law for directing the removal of an inmate's life support treatment in accordance with the opinions of medical professionals, but without the family's consent and in contravention of state law. As discussed above, Plaintiff's reliance on *Davenport* speaks to a different legal issue and is not controlling in this circuit. Plaintiff's other attempt to meet his burden on qualified immunity is a citation to an unpublished, out-of-circuit, district court case, *Estate of Marquette F. Cummings, Jr. v. Commissioner Kim Thomas, et al.*, No. 15 CV 02274, Mem. Op. and Order 17-20 (N.D. Ala. Sept. 21, 2016). That case is insufficient to overcome the clearly established prong of the qualified immunity defense. *Cf. Cummings*, 913 F.3d at 1244 ("Plaintiffs' reliance on *Gardner* is patently misguided. To begin, it is notable that *Gardner* is an out-of-circuit *unpublished* decision; even assuming that such a decision is entitled to any consideration at all in the clearly-established-law analysis, that consideration would be minimal."). Moreover, in the *Cummings* case, the warden had ordered medical personnel to not do anything heroic nor to resuscitate the patient, and the medical personnel removed him from life support based on the warden's directive. *Cummings*, No. 15 CV 02274, Mem. Op. and Order 18. In contrast, according to the complaint's allegations here, all medical staff deemed Martinez incurable and they all agreed with comfort measures and withdrawal of care. While Defendants Gay and Selvage purportedly made the ultimate decision to withdraw life support, they undisputedly did so in accordance with the unanimous medical

consensus. It is not clearly established under Tenth Circuit and Supreme Court law interpreting the Eighth Amendment that Defendants Gay and Selvage violated Martinez's rights to continued medical care under circumstances in which the medical professionals advocated for only comfort care measures.[5] Defendants Gay and Selvage are therefore entitled to qualified immunity, and the second cause of action against them must be dismissed.

**IT IS THEREFORE ORDERED** that the NMCD Defendants' *Motion to Dismiss for Failure to State a Claim and Based on Qualified Immunity and Supporting Memorandum* (**ECF No. 28**) is **GRANTED IN PART AND DENIED IN PART** as follows:

1. NMCD Defendants' request to dismiss Plaintiff's First Claim for Relief against Defendants Archuleta, Palomino, Abate, Anthony Martinez, Ortiz, and Unidentified Day Shift L Pod Control Officer is **DENIED**.

2. NMCD Defendants' request to dismiss Plaintiff's Second Claim for Relief against Defendants Gay and Selvage is **GRANTED** based on qualified immunity.

3. As the only claim against Defendants Gay and Selvage is the Second Claim for Relief, Defendants Gay and Selvage are dismissed from the case.

4. The Court denies the NMCD Defendants' request for their fees and costs.

_____
SENIOR UNITED STATES DISTRICT JUDGE

---

[5] Plaintiff argues that the defendants' decision stripped the family of the right to make Martinez's medical decisions for him, violating state law. Section 1983, however, focuses on a violation of federal, not state, law. *See* discussion *supra*. Plaintiff had the burden to cite authority that Defendant Gay and Selvage's actions violated clearly established federal law, and he failed to do so. This opinion does not address the merits of any other potential state law claim.